We'll call the matters as they appear on the calendar. The first item is Andre Belei v. Castro, Warden. Good morning. Your Honor, if you may please the court, I'm Philip Cardino on behalf of the petitioner. And I suggest to the court that in this case at least, the court is not faced with any novel questions of law or any cutting-edge application of the Antiterrorism and Effective Death Penalty Statute. Instead, the court is faced with what, with all due respect, should be a very disturbing series of facts. And I suggest that in particular, this set of facts should be disturbing because they occurred in the context of what at the time was a death penalty prosecution. You know, we're too old to be, at least to become disturbed. Well, intrigued perhaps, then, Your Honor. Intrigued and brought to the full majesty of the Court's power. Well, you know, these comments about the Menendez brothers are troublesome. There's no doubt about that. One question I had is whether the defense originally brought up that topic. It was discussed at various points in the trial, Your Honor. The reason, in particular, that it became an issue at all was because the expert who was testifying on behalf of the defense, Dr. Foy, had, in fact, also been at issue in the Menendez matter, and there did come up a little bit of interplay between counsel. It was a very — Was the prosecuting attorney also involved in some way in the Menendez prosecution? Yes, Your Honor. Was she the same prosecutor? She was. Okay. Was she the lead prosecutor in the Menendez case? It's my understanding that she was the lead prosecutor in the retrial. And I have to confess that my recall as to who the — whether or not she had a role in the original trial is not clear in this moment. But she certainly had a critical role to play. By the time this case was being tried, she had just — she was fresh from the retrial of the Menendez brothers' case. What's odd is that you had the — Menendez brothers had come up in the context of the expert, and the defense had brought it up, and so it wasn't kind of coming out of thin air when the prosecutor made her remarks. And so the difficulty I have is whether, in the backdrop of having already been introduced to the Menendez brothers, the additional comment that she may have made about basically being tutored by the Menendez brothers in terms of the — this kind of a defense, whether that ends up being harmless in the end. Your Honor, that is entirely out of thin air. There is no — Well, that is, but the Menendez brothers are not out of thin air. The Menendez brothers, there truly was no evidence in it. As regards to that trial, it was the fact that the expert had had a connection to that case, and that, in fact, she had been, presumably to her credit as counsel, equally vigorous in attacking that expert in the previous prosecution. But it's the insinuation of the connection and that this was a feigned diagnosis that is crucial here. And I have to back this all up, if I may, please, Your Honor, to the fact that none of this would have been nearly so crucially offensive if the defendant had not, from the very beginning, not been able to present the necessary evidence of the basis for his post-traumatic stress disorder. And that's where I think it's true. But he was able to testify as to his experiences in Angola. And he was immediately discredited, as you would expect, as a liar with a high motive to fabricate in this instance. He — everyone was on notice from very early in the pretrial proceedings. This was not a whodunit. He admitted the commission of all three homicides. It's clear he sat down after the third homicide, basically waiting in one of the nearby yards until the police arrived. He was dancing with all indications of cocaine psychosis. He was found with a super-elevated level of cocaine metabolite in his system. At the time of his arrest, so bad, and he did not simply — it did not just wear off. The jail psychiatrist had to actually treat him, that his — because of how severely intoxicated he had been for such a sustained period. The — the cocaine — his cocaine addiction and his affliction at the time — his state — his cocaine-induced state at the time of the murders was grounds for — was a defense of diminished capacity. Is that right? It was — that was a partial — As to all three murders. But the post-traumatic stress disorder only went to the murder of the cabbie. The cab driver. Which is — who's — Reveley, is that correct? Revis, yes, Your Honor. Revis. And I have to — that — So the question about post-traumatic stress disorder, Dr. Foy's testimony, the testimony about Angola, whether it's fed or not, only goes to one of the three murders, all of which are admitted. Most respectfully, Your Honor, I have to disagree with that. It is correct that trial counsel at the beginning of the trial took that view. But by the end of the trial, he had already changed his perspective on it, and his declaration subsequently submitted to the lower court in these Federal abuse proceedings indicates very clearly that his position at the beginning of the trial was based on his misunderstanding of the law and his erroneous belief that the PTSD defense would not have operated as to the first two homicides. Well, the jury instructions in the end were not specific to individual homicides. They were general, so they could — presumably, the jury would follow them as to each homicide. That is correct, Your Honor. However, of course, the district attorney was a very adept lawyer in many regards, and she quickly pointed out in her argument in response to the defense's proposition at that point that that evidence had not been received for that purpose. The trial — the court didn't take a response on the position. Its instructions were permissive. And the defect, if you will, in our view, continues to rest with the fact that the defense was as weak as it was precisely because it had never been funded properly, so that the jury would have been better persuaded, or would have been persuaded, if the defendant had ever been allowed to present the necessary evidence to go and obtain it and bring it in to present it. So, Your Honor, when you indicate that he was allowed to testify to it, that is correct. But there he is standing accused of three homicides and in a capital prosecution and the jury, quite properly, as reasonable people, could easily have concluded that his testimony alone was simply not credible. What about the investigator? As I understood, there was a Russian-speaking investigator that was funded that knew how to get government records. Are you saying that he wasn't good enough, or you needed more money to get a different guy? What was the underlying constitutional failure here? The basic one, it's most clearly memorialized in trial counsel's comments just before the trial. On October 15th, right before trial, his application for funds stating that the defense still was not prepared and that it needs these monies to go to Russia and so forth, that application is denied. There is a motley history behind that. And he does state at the beginning of trial, he announces he is not prepared due to this lack of funding. But there is a motley history, and unfortunately, our record today isn't comprehensive to explain exactly what happened. There were numerous applications made. Some of the superior court records, based on this record, do not appear to have been included in the subsequent State appellate proceedings. They were never included in the district court proceedings. It's clear that the direct appeal before the State court of appeals, there was a very hotly contested issue. The appellate counsel who had been underappointed by the court made repeated applications to that court to be allowed to obtain copies of the funding submissions. And that those requests were denied. Ultimately, the State court of appeals simply allowed her to go and look at the records, but she was expressly prohibited from making copies of them. So I wish I could completely and precisely answer your question, Your Honor. Unfortunately, I simply can't. Kagan. Kagan. But that's one of the reasons we add the requests before the court. And the alternative, if the court doesn't deem it appropriate to outright grant the relief requested and grant the petition, to at least order a limited remand to allow us to augment the record and determine precisely exactly what's happened. It is clear, as I've indicated earlier, that the trial counsel was very specific on the eve of trial, in the morning of trial when the case was called for trial, that he was not prepared for trial due to the lack of funding. So whatever may have happened before, and there are indications from my client when he was in pro pur, that he had not received the necessary assistance, it was a limited amount of time, he didn't have an adequate amount of time, he couldn't obtain the necessary investigator. The court, for some reason, on one instance at least, when it did appoint an investigator, refused to appoint the ones that he was requesting, who he had determined, in fact, were able to handle and undertake this investigation. If I may, I'm going to ask to reserve any remaining time for rebuttal. Thank you, Your Honor. Very well. Thank you. Good morning. Donald DeNicola for the State. On the initial question about the references to the Menendez brothers, I think the record shows that the background was that the defense expert on the PTSD testified that he had been involved in a number of other cases in which the PTSD defense was not genuine. On top of that, the defense and redirect of their expert brought up the fact that the prosecutor had been the prosecutor in this case, had been the prosecutor in the Menendez case, and allegedly was taking inconsistent positions with respect to cross-examining the expert. So, and I think the third element of the way the trial unfolded that's significant is that Well, how were those positions inconsistent? Oh, I think the defense counsel was implicitly arguing to the jury that the prosecutor was cross-examining the expert about not taking into account tests that might indicate the presence of malingering, and the defense lawyer, when the prosecutor brought that question up through her questioning, the defense lawyer tried to get the expert to say that in the Menendez trial, the prosecutor had attacked the expert even though the expert had undertaken those malingering tests. So it was a very collateral issue that brought the Menendez question to the extent it was a question of law to the jury. But then the prosecutor, inasmuch as said, what we do know is we got two guys, we have two individuals sitting in the county jail for a capital case, and all of a sudden, this defendant basically conjures up post-traumatic stress syndrome, and voila, seems to be the crime, or, you know, the defense du jour, basically saying, in effect, that this defendant learned about how to put that defense on from the Menendez brothers, and there's no evidence of that, is there? Well, I think what there's evidence of is that through the defense expert, there's evidence that PTSD, in the prosecutor's words, I think arguably was a defense du jour, and there was evidence that the prosecutor was involved in the Menendez case. What does that mean, defense du jour? I think the suggestion is yes. You mean everybody's doing it now? Yes. I think that's my interpretation of it. But there's no evidence that, I mean, I guess the difficulty here is that what the prosecutor's essentially saying is that with the Menendez brothers' help, he has cooked up this defense, and there's no evidence of that. So what we basically have the prosecutor testifying to facts that aren't anywhere in the record, and to the extent there was already problems with the post-traumatic stress defense, basically the nail's in the coffin now, isn't it? Because prosecutor said, and he cooked it up in jail with these other guys who we already know from the newspapers are bad guys. Well, I respectfully suggest, I think that might be an over-reading of the prosecutor's remarks. The prosecutor doesn't say, she doesn't say that the defense, defendant cooked this up with the Menendez brothers. We said suddenly he knows all the symptoms of the post-traumatic stress disorder at the same time that this defense de jure of people facing capital crimes in the county jail from 1994 on. Yes. And I think the difference is that given the way the prosecutor said it, and given what had gone on in the trial, which was not only a trial that had referred to the Menendez case, and a trial that had referred to PTSD as a defense de jure, but on top of that, a trial where the prosecutor in her cross-examination of the defendant stressed heavily the fact that the symptoms, the alleged symptoms of PTSD were all self-reported by the defendant. So I don't think it was news to the jury at this point that the prosecutor's theory was that the defendant had cooked up the symptoms. And I think given that basis in the record, I think it would be an over-reading of the remarks to say that it's a — that it was meant to be. Well, that's — you know, it's pretty inflammatory, though, wouldn't you say? Well, I don't think it's inflammatory in the context of the case. Come on, now. You know, Menendez brothers, it's a — everyone knew about the case. It was a horrible case, killing of parents, reference to that. Well, I think — Those things were horrible killings, too. Well, I think the — yeah, I think the notoriety of the Menendez brothers itself is — I think on their own, I think they're pretty — they're pretty horrendous. But I don't think, in the context of what had gone on in the trial, specifically, the references to the Menendez brothers had insinuated itself into the case in some way, and therefore, I think, kind of lost any explosive effect that it otherwise might have had if the remark had been, you know, one that was — was more direct. But I think the way it stands, what you really have, I think, is a prosecutor who's making an effort to ask the jurors to draw inferences from the evidence that the defense of the PTSD was — was fabricated. And I think that there is a basis in the record for that argument. The reference to the Menendez brothers certainly complicates it in a way it didn't need to be complicated, but I don't know whether or not it would have been complicated in this case. What was that basis again? Well, I think the basis was that through — through cross-examination and admissions by the defendant, that the defendant had acknowledged lying in the past, had acknowledged committing perjury in the past, and the circumstances of the PTSD symptoms were suspicious in that they were all based — they were all based on his self-reporting. The — my opponent here mentions that the defendant was — was somehow prejudiced by this prior decision by the court not to fund the expedition into the investigation into — into the Ukraine and into Angola. In this context, I just want to make a couple of remarks. First, I don't think that's fairly within the certificate of appealability, the question of the propriety, the constitutional propriety of those rulings. I think what the certificate of appealability refers to is specifically the reference to the Menendez brothers. And I don't think that one is fairly subsumed in the other. Nevertheless, the judge in the case allowed the defendant to testify completely about his experiences in the Red Army in Angola. That was the basis. That was the proffered basis for the investigation into Angola and Ukraine. And the judge instructed the prosecutor not to argue that the jury should disbelieve the defendant's testimony about his combat experiences on the ground that they weren't corroborated by — by other — by other evidence. What the prosecutor stressed instead, and quite properly, was that the post — post-arrival in America stressed symptoms that the defendant self-reported were not corroborated and therefore should be viewed by the jury with distrust. So I don't think that there's any real connection, even if the issue were between — were within the state of America. What if we were to disagree with you and determine that the prosecutor's statements did violate the Confrontation Clause? Would that be the end of the analysis? Well, no, Your Honor, because even though under the Ninth Circuit's AEDPA, jurors have the right to make their own judgments, I don't think that there's any real connection. I think that the fact of the matter is that the U.S. Supreme Court has never held that a remark by a prosecutor can violate the — the Confrontation Clause. A prosecutor isn't on the witness stand, hasn't been — hasn't been sworn, doesn't present him or herself as a witness. So I think it would be either a new rule of law under Teague or it would be a rule of law that would be unavailable to the defendant under the AEDPA because it hasn't been clearly established by a U.S. Supreme Court precedent. But the jury knew that she was the prosecutor in the Menendez case. Yes, the jury knew that because it had come out in the — in the cross-examination. In fact, I think it was the defense expert's own testimony that established her identity as the prosecutor in the Menendez case. And in the closing argument, the defense lawyer, prior to this remark by the prosecutor, again alluded to the Menendez case. So again, the Menendez case, for better or for worse, and for whatever reason, had somehow insinuated itself into the case. I think what ultimately happened was the prosecutor, in making a — a rational argument, or at — or at the very least, an argument that was — that didn't purport to be anything more than an argument based on the evidence at the trial, didn't purport to do anything more than ask the jurors to draw an inference from the evidence presented at the trial. That was a prejudicial argument, wasn't it? Well, I don't — well, I don't think it was — it was prejudicial, I think, in the sense that it's allowed to be prejudicial. I think it's okay for the prosecutor to — to ask the jury to draw a prejudicial inference about the credibility of the defense based on evidence at trial. And I think that's really all this — this statement ever actually was. I think the — the fact that the Menendez brothers was in the air, I think all — all that really added to this was kind of a — a literary or a rhetorical crutch or device that allowed the jur — the prosecutor to segue from the reference to the Menendez brothers into the suggestion, again, based — a suggestion that really was nothing more than an argument that purported to be based on only the evidence at trial, to make that argument. What about — what about the defense de jure argument? Well — It's like everybody's doing this now. It's — That was also — see, there's also a factual basis for that in the record, too, Your Honor, because the defense — the defense expert testified that he was aware of and had been involved in a number of cases in which, as an expert, in which the PTSD defense was — was not true. Was the de jure business her gloss on it, or had that phraseology been used earlier? I — I don't think the phraseology had been used earlier. But — but I think the factual basis that supported the — the phraseology, I think, is — is fairly in the case. And, again, I don't think — the Supreme Court instructs that the Court shouldn't take a remark from the prosecutor, one remark from, you know, the entirety of a — of a 65-page closing argument, and — and read into it the worst intention and the worst effect. Here, I think it's pretty plain that the argument never purported to — to tell the jurors that — that — that anything other than she was — that there was a — a circumstance about the — the suspiciousness of the defense that the jury should consider and that that circumstance was based specifically or adequately on — on the record. And even if it wasn't adequately on the record, even if it were just speculation on the prosecutor's part, even if the prosecutor was asking the jurors to make an argument that the record flat-out just didn't support, it still was in the nature of an appeal to the record asking the jurors to draw a logical inference. And — and if the inference wasn't there, I think that doesn't make it misconduct. I think it just makes it an argument that probably should fall flat on its — fall flat on its face. But it's not misconduct. It's not a due process violation. And under the ADP-AFT, it can't be dealt with as a confrontation clause violation. But do you think that she realized that — that that reference of the Menendez brothers and the defense du jour was highly prejudicial? Well, I think — Didn't she realize that? I think what she probably realized was that — that given the state of the record that she had developed and had been developed on cross-examination from the expert, she had an opening to make a — a — a good argument that this defense was concocted. The reference to the Menendez brothers, I can't read her mind, but I — to me, the most plausible interpretation is that the Menendez brothers had been mentioned, fortunately or unfortunately, so many times during the trial by both sides that it just became an entree into making the legitimate point that she made to the jurors that, again, was nothing more than an appeal based on the evidence in the record. Thank you, Your Honor. Your Honor — Your Honors, if I may, the Menendez brothers came up in the trial for the precise reason that the defendant has been prejudiced, and that is because the PTSD defense was hamstrung, prosecution was zeroing in on it with a razor-sharp attack, and Dr. Foy, who is a nationally renowned expert in PTSD, kept acknowledging a problem that he had in his presentation, which was that he had not received corroborative evidence. He had requested it. He knew that it was necessary. His post-trial declaration states that this was a serious deficiency in the presentation of the defense. And so that's the reason the Menendez brothers — If he had asked this to the defendant, what more would Dr. Foy have needed to see that could have come from Russia? He wanted extrinsic proof that, in fact, the petitioner had been in Angola, that he had actually seen the combat that he had described, that he had, in fact, been hospitalized upon his return to Russia, that he had not received any type of psychiatric counseling or any type of therapy following these horrific events. But why would that help — why would that help Dr. Foy? I mean, he's not — Precisely to respond to the — and I'm sorry, Your Honor — If he had medical records from Russia of treatment of Mr. Belay after his experiences in Angola, that might be one thing for the doctor to be looking at, medical records. But to get corroborative evidence that he had no treatment is — seems that he can certainly take Mr. Belay's word for that and proceed from that assumption, which is exactly what happened here. Well, even if he'd gotten records that showed that he had received treatment — And the judge said that — told the jury that they were to accept what the defendant said about his service. I have to tell the Court, I do not recall such an instruction. I cannot correct counsel as erroneous in that regard, but that's not an instruction that I recall as I stand here. And, Your Honors, any type of extrinsic evidence with regard to my client's service in Angola with regard to the events that he saw was what Dr. Foy was looking for. Not — the operative question would not have been did or did he not receive psychiatric treatment upon his return to Russia. I'm sorry, Your Honor, if I gave the Court that impression. It would have been simply that all of these events did occur. Whether my client put one twist or another twist on them, that would not have been a surprise to Dr. Foy because he's used to seeing, and this is where his particular expertise comes into play, that these types of events do distort the individual's perception of reality thereafter. How is that issue contained within the Certificate of Appealability with respect to the Menendez brothers? It seems to me the funding, it's — it's, I think, good lawyering on your part, but it seems a stretch to put it in that COA. With all due regard, Your Honor, if I may address the COA, the two questions it did issue, I think, I understand, I recognize the enormous amount of resources this Court dedicates to that process, and I'm respectful of it. But this trial record, I see a lot of these records, as I know Your Honors do. This record is rife with the deficiencies caused by the lack of funding. The Menendez brothers' comment is the capstone to all of that. And I can appreciate that in its press of business, the Court may have simply noticed that particular issue, which I think is very meritorious for Your Honor's review, and it appropriately issued a COA as to that, but it could not, given its other commitments at that time, perhaps have appreciated how extensively the record reflects the acrimonious and very constant fight over the funding question, which is underneath all of it. The cap, and it was my position and remains throughout the pleadings I've submitted to this Court from the very beginning when I made motion for investigative funds, when I renewed my client's previous motions for an expanded COA for reconsideration of the scope of the COA the Court issued. Those motions are still pending in front of the Court. I've renewed it again in the AOB. I have to respectfully suggest that I think that the Court, it was my honest read of the certificate that was issued, the Court could perhaps have just been in shorthand saying, fine, address this, recognizing that the Menendez brothers' comment had the power that it did because my client was without any force to respond to it, and the reason he didn't have any ability to respond to it, he hadn't had the money he needed to prepare his defense. The second question. You don't think that a psychiatrist examining an individual who tells the psychiatrist about certain events that the individual experienced, that the psychiatrist isn't qualified to determine whether that person is suffering from post-traumatic stress disorder or not? I do believe, Your Honor, that such a trained individual would have that expertise, and I think Dr. Foy is that type of an expert. I also think, though, that Dr. Foy was constantly subjected to cross-examination. What corroboration was he going to get? First of all, it's kind of hard for me to visualize and think about the Russians coming out and giving us service records of his people who were in Angola. Your Honor, even if he'd been able, whether he was able to obtain service, if he had anything to show that in fact these events, that he even went to Angola, if he even was able to bring in other witnesses who knew him from those service days, if he had been able through the service, through the military, to locate other individuals and bring them forward, anything, I don't suggest that the only way due process could have been served would have been for him to have the full panoply of all witnesses possible to explain and assert and prove that he underwent these horrific events. Well, how would you find this? You'd have to go back to the units that were sent to Angola and then start searching for survivors and then trying to find out where, how many years ago was it? Well, at this, at that time, it was relatively recent. Today, we're further removed from it. Trying to find these people? Your Honor, he had, he gave. It would be a pretty big undertaking. It would have been a challenge. I respectfully suggest to the Court that's one reason that it was a modest request for funding that was put before the Superior Court. But he was giving detailed explanations of what he intended to do. He gave names of witnesses he would seek to locate. He gave the type of records that he would seek to produce. This wasn't just some wild fishing expedition he was proposing. He knew exactly what he was looking for, or at least where he thought he could start. And in Dr. Foy's declaration, he explains that any of this would have helped fend off against the cross-examination he underwent. And Dr. Foy honestly and I think very forthrightly acknowledged that he had been involved in cases before where there had been attempts to feign a post-traumatic stress disorder. I don't recall his testimony to the effect that counsel suggested there were numerous such other cases. But I do acknowledge that Dr. Foy said, yes, he'd seen those things before he'd learned to winnow them out. That was just simply truthful testimony. I think any expert must eventually be presented with such cases. But the prosecution used it and built on it and said, that's exactly what's going on here, ladies and gentlemen. And we come right back to the same court problem. The Petitioner was without any means to respond to those various accusations that hounded him. And if I may, one final point. And I apologize. I realize my time has long since been exceeded. But the Court earlier focused on the question of his suddenly knowing in jail, in the context of the Menendez brothers' comment, that he suddenly knew the symptoms of PTSD. There's no evidence that my client ever knew the symptoms of PTSD. There is evidence that he presented a relatively full constellation of PTSD in his interviews with Dr. Foy. And Dr. Foy's testimony was that he, Dr. Foy, never told my client what the constellation was that was necessary to achieve such a diagnosis. So that was a further gloss that Ms. Najera put on the trial. Thank you, Your Honor. The matter will stand submitted. We'll come to the next matter, which is Sarag Heckert v. Masrock, Inc. That's submitted. We come now to China National v. Apex Digital. Thank you.
judges: Pregerson, McKeown,bybee